Filed 6/18/26  In re A.S. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.S., a Person Coming Under the Juvenile Court Law. | B346045 (Los Angeles County Super. Ct. No. 25CCJP00282) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. M.K., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Nancy Ramirez, Judge.  Dismissed.

Benjamin Ekenes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

M.K. (father) appeals from a dispositional order of the juvenile court requiring him to submit to 10 random drug and alcohol tests.  As we find the appeal moot, it is dismissed.

## COMBINED FACTUAL AND PROCEDURAL BACKGROUND

**Initial referral**

A.S. was born in January 2025.  On January 27, 2025, a Los Angeles County Department of Children and Family Services (DCFS) social worker responded to an immediate response referral expressing concerns about the infant's release from the hospital due to suspicions that the home was unsafe and the mother was a victim of ongoing domestic violence.

On January 28, 2025, a DCFS representative entered Lucia S.'s (mother) hospital room and notified her and father that a hospital hold was being placed on the newborn due to concerns regarding domestic violence.

**Investigation**

Mother had visited the medical clinic numerous times. During visits, mother bore various bruises and scratches that were consistent with domestic violence.  At times, mother disclosed she was fleeing from domestic violence and needed a safe haven.  Mother would provide no details about who was abusing her but said she was ready to leave him.  Mother would then change her mind and deny being in danger.  Mother sometimes stated there was domestic violence, but she did not want to make a report.  Mother reported living in a home with a "bunch of men" and smelled them using marijuana.  Mother reported concerns of food insecurity and unstable housing.

On September 19, 2024, mother admitted being a victim of domestic violence and agreed to enter the Missionaries of Charity

shelter.  However, when she returned to the clinic a couple of weeks later, she did not want to discuss what happened at the shelter.  Shelter officials later reported mother had called father to the shelter where father and mother then engaged in an argument.  Shelter officials stated they would refuse to accept mother at the shelter in the future.

A registered nurse at the hospital told the social worker the staff at the facility was very familiar with mother due to the frequency of her visits to the facility.  Mother had a history of disclosing domestic violence or hinting at domestic violence by father, but when questioned, became evasive and vague and downplayed what she previously disclosed.  The nurse could recall 28 times when mother was treated at the hospital and domestic violence was in question.  A hospital employee witnessed father verbally assaulting mother.

Mother stated she was not close to her family.  When asked about allegations of sexual abuse in the maternal family, mother responded, "I don't want to say anything."  Mother declined the suggestion to have the baby placed with maternal family.  Mother admitted smoking marijuana up until her second month of pregnancy but denied use of marijuana since then.  Mother denied a history of drugs or alcohol and denied any history of mental health concerns.

When asked about domestic violence, mother stated, "We're okay now.  I don't want any problems."  When further pressed, mother declined to continue the interview.

A hospital social worker reported concerns for mother's mental health and noted mother's stories were inconsistent.  In January 2025, mother had reported to the social worker, "There is some domestic violence but I don't want to speak about it because I don't want to get father in trouble."  Mother had a

bruise on her right wrist at the time of the interview. Mother had been at the hospital frequently and hospital staff had made extensive efforts to connect mother with domestic violence services. Mother had been to the hospital 14 times in the last month. During those visits mother referenced domestic violence concerns and concerns for her safety once she gave birth, fear of being discharged to father's residence and reports of sexual abuse within mother's family, explaining a reluctance to seek support from maternal family.

Emergency documentation dated January 1, 2025, reported mother presented herself at the hospital with "concern for safety at home." Appellant stated that "she currently lives with her boyfriend and he occasionally strikes her in the setting of drug/alcohol use."

Dr. Pickett had provided medical care to mother since the first trimester of her pregnancy. Dr. Pickett believed mother's multiple visits to the hospital were an attempt to avoid violence at home. The doctor observed mother with a black eye. When he questioned mother about the condition, mother said, "I don't know what you're talking about," repositioned her body and covered her eye with her hand to hide the injury. Mother would arrive at the "OB triage" around 5:00 p.m. when there was a shift change, resulting in her being informally admitted and staying overnight at the hospital. Dr. Pickett said this would occur two or three times per week. Due to mother's countless visits to the facility, there was an "extreme concern for the safety of the child and mother" if they lived with father. Dr. Pickett stated, "We believe that if the child is released to mother and they go home with father, the child is in danger of being injured or will die."

Father denied engaging in any verbal or physical conflict with mother. When asked about mother's injuries, father

4

responded, "I don't know.  Ask her …."  Father denied observing mother with a black eye.  Father stated that maternal grandmother told father mother has mental issues and had attempted suicide approximately three to four years earlier.  Father was unaware of other individuals in his home smoking marijuana, reporting that he rented the master bedroom and stayed there.  Father denied mental health issues or consuming illegal substances.  He did report drinking beer and whiskey socially but denied abusing alcohol.  Father said when he drank, he would become "jolly" and was "cool with everyone." Father denied a prior arrest or criminal record and admitted to smoking marijuana prior to mother's pregnancy, stating he did not know how to roll a joint, but mother would roll the joint for them.  Father denied smoking marijuana since mother became pregnant.

When the social worker suggested a safety plan in which mother and the baby would stay at a domestic violence shelter, father stated there was no need for a safety plan when everything was fine.  When the social worker reminded the parents of DCFS's concerns and asked again about the safety plan, mother asked father, "Are you okay with that?  What do you want to do?" Father replied, "Either we live together otherwise I will call your mom and you can live with her."  Father then left the room.  The social worker asked mother if she would be willing to go with the baby and stay with maternal grandmother.  Mother replied, "I plead the fifth."  Mother then stared blankly at the ceiling and said nothing further to the social worker.

**Juvenile dependency petition and detention hearing**

On January 30, 2025, DCFS filed a Welfare and Institutions Code[1] section 300 juvenile dependency petition on behalf of A.S. alleging domestic violence between the parents and that mother had mental and emotional problems. On February 28, 2025, DCFS filed a first amended dependency petition adding allegations to the domestic violence counts.

On January 31, 2025, the juvenile court found A.S. was described by section 300 and ordered the child suitably placed with monitored visits for the parents.

**Jurisdiction and disposition**

A.S. was placed with a foster parent. Mother and father continued to live together.

In a May 6, 2025 last minute information for the court, DCFS brought to the court's attention the January 1, 2025 report in which mother said father occasionally strikes her in the context of drug and alcohol use. DCFS recommended "in addition to the recommendations listed in the Addendum Report dated 05/06/2025, the father … also submit to random and on-demand drug testing."

On May 6, 2025, the juvenile court dismissed count a-1 but sustained the remainder of the first amended petition alleging domestic violence between mother and father and mother's history of mental and emotional problems.

For disposition, the juvenile court ordered father to complete a 52-week domestic violence program, a parenting program, individual counseling, submit to 10 random and on-demand drug and alcohol tests, drug and alcohol test upon

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

reasonable suspicion, and complete a full drug and alcohol program if there was a missed or positive test.

Regarding the substance abuse component of father's case plan, the court stated, "With regard to the department's request for him to do some random tests, the court notes in the dispositional hearing all evidence comes in. And while the court did not sustain a count related to drug use there are reports that he did perpetrate violence while he was under the influence of alcohol or marijuana. And given the very young age of this baby, she is only about three months old, the court would like to see that he is sober and able to safely care for this infant and will order ten random drug and alcohol tests. If any test is an unexcused missed or a positive test department may walk the matter on calendar for further orders."

On May 7, 2025, father filed a notice of appeal from the juvenile court's judgment and orders of May 6, 2025.

## PROCEEDINGS ON APPEAL
**Father's appeal**

Father's appeal challenged only the juvenile court's order requiring him to submit to 10 random and on-demand drug and alcohol tests. Father argued the order was an abuse of the juvenile court's discretion because there was no substantial evidence that the drug testing was designed to eliminate the conditions that led to the juvenile court's finding that the minor is described under section 300.

**DCFS's first motion to dismiss the appeal**

DCFS filed its first motion to dismiss the appeal on March 17, 2026, arguing father's appeal should be dismissed under the disentitlement doctrine because appellant was in contempt of the order he challenged on appeal. (*MacPherson v.*

7

*MacPherson* (1939) 13 Cal.2d 271, 277 ["A party to an action cannot, with right or reason, ask the aid and assistance of a court in hearing his demands while he stands in an attitude of contempt to legal orders and processes of the courts of this state."].) DCFS stated father had refused to submit to any drug and alcohol tests; therefore, he is prevented from challenging the order on appeal.

Father opposed the motion by arguing it would be inappropriate to apply the disentitlement doctrine in this case and that dismissal without a written opinion would be improper.

**DCFS's second motion to dismiss the appeal**

On May 20, 2026, DCFS filed a second motion to dismiss the appeal and accompanying request for judicial notice.[2] DCFS's motion claimed father's appeal is moot because reunification services have been terminated.

DCFS argued an appeal is moot where the reviewing court cannot provide the appellant with any effective relief. (*In re D.P.* (2023) 14 Cal.5th 266, 277.) "[R]elief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.'" (*Ibid.*) While there are some exceptions to this rule, DCFS argues none are present here. Since the court has terminated family reunification services, the challenged order no longer exists. Therefore, DCFS argues, this court cannot provide father with any effective relief. Because there is no practical

---

[2] The request for judicial notice was to take judicial notice of the juvenile court's minute order from the April 7, 2026 12-month review hearing, where the juvenile court found the parents' progress with their court-ordered case plans unsubstantial and terminated family reunification services. The court set a section 366.26 permanency planning hearing for August 4, 2026.

DCFS's request for judicial notice is granted.

8

reason to review an order that no longer exists, DCFS argues, the appeal should be dismissed.

On June 4, 2026, father filed an opposition to DCFS's second motion to dismiss, arguing, among other things, the order at issue is an important issue capable of repetition yet evading review. (Citing *In re Miguel A.* (2007) 156 Cal.App.4th 389, 392.)

## DISCUSSION

"A court is tasked with the duty "'to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.""" (*In re D.P., supra*, 14 Cal.5th at p. 276.) "A case becomes moot when events "'render[] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief."'" (*Ibid.*) "For relief to be 'effective,' two requirements must be met. First, the plaintiff must complain of an ongoing harm. Second, the harm must be redressable or capable of being rectified by the outcome the plaintiff seeks." (*Ibid.*)

A court has the discretion to hear a moot appeal where (1) the appeal presents an issue of broad public interest that is likely to recur; (2) there may be a recurrence of the controversy between the same parties; and (3) when a material question remains for the trial court's determination. (*In re D.P., supra*, 14 Cal.5th at p. 282.) In the context of juvenile dependency matters, various other circumstances may arise causing appellate courts to "exercise their inherent discretion to decide certain challenges to juvenile court jurisdictional findings, notwithstanding mootness." (*Id.* at p. 285.)

9

The order father challenges here is a dispositional order requiring him to submit to 10 random and on-demand drug and alcohol tests. Since the juvenile court has terminated father's reunification services, this court can no longer provide father with effective relief. There is thus no practical reason for this court to review the challenged dispositional order.

Father's argument that the matter before us is an important issue capable of repetition is not well taken. Dispositional orders are often challenged and reviewed on appeal when ripe. (See., e.g., *In re S.F.* (2023) 91 Cal.App.5th 696, 724–726.) We also reject father's argument that his compliance or noncompliance with the drug testing order may impact his ability to file a petition pursuant to section 388 in the future. Any potential section 388 petition, and the drug testing order's impact on such a hypothetical motion, are abstract propositions that have no bearing on this matter. (*In re D.P., supra*, 14 Cal.5th at p. 275.) Under the circumstances of this case, we decline to exercise our inherent discretion to hear this moot appeal.

## DISPOSITION

The appeal is dismissed.


CHAVEZ, Acting P. J.

We concur:


RICHARDSON, J.                    GOORVITCH, J.

10